UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ESSEX INSURANCE COMAPNY | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:09-cv-193 |
| | § | |
| NEIL McFADDEN, KLN | § | |
| CONTRACTORS, LLC, and POINTE | § | |
| COUPEE ENERGY, INC. | § | |

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Plaintiff Essex Insurance Company's Amended Motion for Final Summary Judgment (Doc. No. 25). Having considered the motion, Defendant Pointe Coupee Energy's response, and the documents filed in this case, the motion is hereby DENIED.

**I. Background**

This case is a suit for declaratory relief in which Plaintiff Essex Insurance Company (Essex) asserts it has no coverage for and no duty to defend Neil McFadden (McFadden), KLN Contractors, LLC (KLN), and Pointe Coupee Energy (Pointe Coupee) in connection with subrogation claims brought by Great American Insurance Companies (Great American) in the underlying case. The underlying action, *Great American Insurance Companies a/s/o Southland Disposal v. Pointe Coupee Energy and KLN Contractors*, Cause No. 2008-091, is currently pending in the 123rd District Court of Panola County, Texas. In the instant case, all Defendants have been served, and only PCE has answered.

In the underlying lawsuit, Great American filed a subrogation action to collect damages it paid to its insured, Southland Disposal, Inc. Great American alleges that

Southland retained KLN to "repair a load ramp connected to Southland's saltwater disposal trough" at a plant near Beckville, Texas. "In turn, KLN delegated this assignment to McFadden, who is also the principal owner of KLN." (Pl. Ex. B at par. V). KLN and/or McFadden was making welding repairs between deliveries of flammable condensate into a disposal trough. Pointe Coupee was responsible for developing the plan and monitoring the procedure for unloading the trucks, rinsing the trough, and for permitting welding. Great American claims the trough would be emptied, washed clean, and welding was resume after the condensate was unloaded from each truck. *Id*. On July 12, 2007, McFadden and/or KLN allegedly failed to properly wash and rinse the saltwater trough after the last truck delivered flammable condensates. When the welding operations resumed, sparks ignited resulting in a fire. *Id*. The fire ultimately reached a saltwater holding pit causing damage not only to the trough, but also a small pump, large welding pump, priming chambers, fencing, reinforced hose, an outdoor light pole, electrical wiring, and plumbing repairs. *Id*.

Great American alleges that its insured, Southland, incurred costs of $116,520.43 to repair the damage. (Pl. Ex. B at par. V). Great American contends that Pointe Coupee was negligent for failing to properly plan and supervise the trough cleaning operations and that KLN and McFadden were negligent for failing to cleanse all condensate from the trough prior to welding. (Pl. Ex. B at par. VI). Great American alleges that Pointe Coupee, KLN, and McFadden should be held jointly and severally liable. (Pl. Ex. B at par. VII). Pointe Coupee filed cross-claims against KLN and McFadden for negligence. (Pl. Ex. C at par. VI).

Pointe Coupee also alleged that McFadden and KLN constitute a joint and single enterprise so that the protection of McFadden's individual liability should be disregarded under the law. *Id*.

McFadden, KLN, and Pointe Coupee all submitted claims to Essex for coverage under a commercial liability insurance policy numbered 3CV6912 (the Policy) issued by Essex to McFadden and/or KLN and naming Pointe Coupee as an additional insured. (*See* Pl. Ex. A). Essex denied coverage and filed this case seeking a declaration that Essex has no coverage for and no duty to defend McFadden, KLN, and Pointe Coupee. Specifically, Essex claims that several terms, limitations, and exclusions in the Policy preclude coverage for the claims asserted by Great American.

Essex filed the instant motion for summary judgment and requested that the Court enter final judgment declaring that the Policy provides no coverage for and no duty to defend Defendants. In response, Pointe Coupee requests that Essex's motion be denied and that the Court enters an order declaring that Essex owes a defense to Defendants for the claims asserted by Great American in the underlying action. As such, the Court will consider Pointe Coupee's response as a cross-motion for summary judgment.

The Court will consider all claims related to the duty to defend, and will abstain from any ruling on the duty to indemnify until the underlying case has been resolved.

## II. Summary Judgment Standard

A motion for summary judgment should be granted if "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The moving party must show initially that there is no genuine issue concerning any material fact in the case. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48, 256 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248; *Merritt-Campbell, Inc. v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248; *Merritt-Campbell, Inc.*, 164 F.3d at 961. The moving party may also meet its summary judgment by pointing to the absence of evidence supporting any non-movant's claim. *Celotex Corp.*, 477 U.S. at 325.

Once the moving party has satisfied its burden, the party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials in its pleading, but must "set forth specific facts showing that there is genuine issue for trial." *Anderson*, 477 U.S. at 256. The non-movant is required to identify evidence in the record and articulate the manner in which that evidence supports its claim. *Ragas*, 136 F.3d at 458. If the non-movant fails to set forth specific facts to support an essential element in that party's claim and on which that party will bear the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322-23.

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Merrit-Campbell, Inc.*, 164 F.3d at 961. "Only disputes over facts that might affect the outcome of the suit under the governing laws

will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Irrelevant or unnecessary factual disputes should not be considered. *Id.*

For cases in which the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995); *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) ("A federal court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly."). Interpretation of an insurance policy is a question of law particularly appropriate for summary disposition. *Principal Health Care of La. v. Lewer Agency, Inc.*, 38 F.3d 240, 242 (5th Cir. 1994); *Tri Core Inc. v. Northland Ins. Co.*, No. 3-01-CV-1431-BD, 2002 WL 31548754, at *4 (N.D. Tex., Nov. 12, 2002). The remaining issues in this case turn entirely on the meaning of the insurance policy agreed to by the parties, and the policy's application to facts which are not in dispute. As such, the Court finds that the remaining issues are purely legal ones properly subject to disposition in a summary context.

### III. Duty to Defend Standard

Insurance policies are simply a specialized form of contract. *Tex. Farmers Ins. Co. v. Murphy,* 996 S.W.2d 873, 879 (Tex. 1999). Thus, general rules of contract construction apply. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Texas follows the "eight corners rule" in which the Court determines an insurer's duty to defend by examining "the third-party pleadings, considered in light of the policy provisions, without regard to the

truth or falsity of those allegations." *GuideOne Elite Ins. Co. v. Fiedler Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).

Policy language that is unambiguous or, in other words, so clearly worded that it can be given a definite legal meaning, is applied as written. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995)). However, where a provision "is susceptible of two or more reasonable interpretations," the provision is deemed ambiguous and courts will construe the meaning of the ambiguous provision in the light most favorable to the insured. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). *See also Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996) ("This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the consumer . . . . The insurance companies write the policies; we buy their forms or we do not buy insurance."). This does not mean that every ambiguous insurance policy provision will be ignored or interpreted in a way that mandates coverage for the insured. Rather, it means that the broadest or narrowest reasonable definition, whichever favors the insured, will be applied to the ambiguous term. If such application still does not militate in favor of coverage for the insured, the Court will not expand the language of the contract. *See Gregory v. Home Ins. Co.*, 876 F.2d 602, 604–06 (7th Cir. 1989). Courts will not rewrite the contract in an effort to provide coverage where none was contemplated.

Although "the burden is typically on the insured to show that a claim against him is

potentially within the scope of coverage under the policies, when the insurer relies on the policy's exclusions, it bears the burden of proving that one or more of those exclusions apply. *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 592 F.3d 687, 691 (5th Cir. 2010) (quoting *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 723 (5th Cir. 1999)). When assessing the insurer's proffered exclusion, "[t]he court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Trinity Universal*, 592 F.3d at 692 (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004) (internal cites omitted)).

## IV. Analysis

Essex claims that several terms, limitations, and exclusions in the Policy preclude Essex from defending Defendants in the underlying case: (1) Section II—Who Is An Insured limits coverage from an individual to conduct a business for which the insured is the "sole owner;" (2) Combination General Endorsement M/E-001, at paragraph 1, restricts coverage to the operations described under the "business description" and/or "classification" on the declarations; (3) Combination Endorsement M/E-001, at paragraph 8, restricts coverage for "professional services;" (4) Exclusion J Damage to Property restricts coverage for property damage to that particular part of any property because "your work" was incorrectly performed on it; (5) Exclusion K Damage to Your Product restricts coverage for damage to property in

the insured's care or damage to the insured's work; and (6) the Additional Insured Endorsement limits coverage for Pointe Coupee only as respects the negligent acts or omissions of McFadden and only for occurrences, claims, or coverage not otherwise precluded. The Court will address each of these limitations in turn.

**1) Section II—Who Is An Insured**

Essex first claims that it does not owe KLN a duty to defend under Section II of the Policy. The Policy states in Section II—Who Is An Insured that when the Declarations designate the Named Insured (the term "you" refers to Named Insured as noted in the preamble before the Coverages Section of the policy) as an individual, then only the individual and his/her spouse are insureds and only with respect to conduct for the business of which the insured is the "sole owner." (Pl. Ex. A at 000029). Neil McFadden is the Named Insured. *Id*. In the underlying suit, McFadden is alleged to the "principal owner" of KLN, not the sole owner. (Pl. Ex. B at 1). Essex argues that, given their ordinary meanings, the words "sole owner" are not the same as "principal owner." Because McFadden is not the sole owner of KLN, Essex argues, there is no duty to defend KLN.

In response, Pointe Coupee agrees that the words 'sole owner' are not the same as 'principal owner.' However, Pointe Coupee argues that one can be the principal owner *and* the sole owner, or one can be the principal owner *and not* the sole owner. As such, the allegation that McFadden is the principal owner of KLN has no bearing on whether he is also the sole owner of KLN.

Words in an insurance policy will be given their ordinary meaning unless they are technical in nature. *Security Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979). However, the allegations of the underlying petition must be read liberally, and unless those allegations affirmatively establish that there can be no coverage, the insured is entitled to a defense. *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490–91 (Tex. 2008). Here, the allegation that McFadden is the principal owner does not affirmatively establish that he is not the sole owner. The Court agrees with Pointe Coupee that the words principal owner and sole owner are not mutually exclusive; one can be the principal owner as well the sole owner. Because Pointe Coupee has offered a reasonable construction of the words, the Court must adopt the interpretation offered by Pointe Coupee. *See Trinity Universal*, 592 F.3d at 692. Accordingly, the Court finds that the Policy provision Section II—Who Is An Insured and the underlying allegations do not affirmatively establish that there is no duty to defend.

**2) Operations Described Under the "Business Description" and/or "Classification" on the Declarations**

Essex next contends that it has no duty to defend McFadden because the Policy restricts coverage to "operations described under 'business description' and/or 'classification' on the declarations pages of the policy" and McFadden was not engaged in such operations at the time of the incident. (Pl. Ex. A at 00006). The policy states that coverage is provided for "above ground water line installation/service" with a classification for the insured as "water mains or connections construction." (Pl. Ex. A at 00001-00002). Essex argues that there is no indication in the business description or classification that McFadden would have liability

exposure for fire damage in a saltwater disposal pit resulting from the performance of welding work on a grate. Essex further argues that the work described in underlying pleadings was not above ground water line installation or service, nor was it water main or connections construction.

In response, Pointe Coupee points to the underlying allegation that Defendants were involved in service work on a saltwater disposal trough. (Pl. Ex. B). The trough was used to transport saltwater from trucks to a disposal pit, and Pointe Coupee argues that it was therefore an above ground water connection. "Above ground water line installation/service" and "water mains or connections construction" are not defined in the Policy, and Pointe Coupee argues that as such their ordinary definitions must apply. Pointe Coupee claims that "[o]rdinarily there is no limitation on the word 'water' to exclude saltwater, there is no limitation on the words 'service' or 'construction' to exclude welding repairs, and there is no limitation on the words 'water mains' or 'water connections' to exclude water troughs." (Doc. No. 24 at 10). Pointe Coupee then argues that the business description and classification include construction on a saltwater line.

Words in an insurance policy will be given their ordinary meaning unless they are technical in nature. *Security Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979). When assessing the insurer's proffered exclusion, "[t]he court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or

a more accurate reflection of the parties' intent." *Trinity Universal*, 592 F.3d at 692. The Court finds that Pointe Coupee has offered a reasonable construction of the words "above ground water line installation/service" and "water mains or connections construction." As such, the Court must adopt the interpretation offered by Pointe Coupee. *See Trinity Universal*, 592 F.3d at 692. Accordingly, the Court finds that Defendants' operations fall within the business description and classification for the purposes of the duty to defend.

**3. Professional Services Exclusion**

Essex next claims that coverage for negligent work is excluded under Combination General Endorsement M/E-001, paragraph 8 (Pl. Ex. A at 00006). Paragraph 8 provides that "negligent acts...of any type including rendering or failure to render any type of professional service is not covered under this policy, unless such coverage is specifically endorsed onto the policy." *Id*. Essex argues that welding is a professional service because it is a skilled task requiring specialized training or experience. Further, because there is no suggestion that McFadden employed or used welders, the policy excludes coverage for negligent welding work.

In response, Pointe Coupee argues that the most common definition of professional services is an act or service "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill, and the labor or skill is predominately mental or intellectual, rather than physical or manual." 23 David H. Topol, *Appleman on Insurance Law and Practice* § 146.1 (2d ed. 2007). Pointe Coupee claims that the alleged acts of

McFadden and KLN were acts of physical and manual labor and, as such, are not professional services.

The Policy does not define "professional services." When a policy does not specify a definition of professional services, the Court is "free to apply the legal definition of 'professional services' to the exclusion, and Texas courts, as well as courts interpreting Texas law, often do so." *Admiral Ins. Co. v. Ford*, No. 09-50671, 2010 WL 2026699 at *3 (5th Cir. May 21, 2010). Texas Courts have held that a professional must perform more than an ordinary task to perform a professional service. *See Atlantic Lloyd's Ins. Co. of Tex. v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 476 (Tex.App.–Dallas, 1998). In order to qualify as a professional service, "the task must arise out of the acts particular to the individual's specialized vocation. [The court does] not deem an act a professional service merely because it is performed by a professional. Rather, it must be necessary for the professional to use his specialized knowledge or training." *Id.* at 476–77. Thus, a professional service is an act that "uses the inherent skills typified by the profession." *Id.* at 477. Acts that are incidental to the profession are not professional services. *Id.*

The Court holds that Essex has not proven that welding is a professional task. Specifically, Essex has not shown that welding is a task that arises out of the acts particular to McFadden's specialized vocation, nor that it is necessary for McFadden to use his specialized knowledge or training. Further, the negligence alleged by Great American arises out of McFadden and KLN's failure to properly clean the trough, not improper welding.

Essex does not argue that cleaning a trough is not an act of professional service. Accordingly, the Court finds that the professional services exclusion does not exempt Essex from the duty to defend.

**4) Exclusion J Damage to Property**

<u>Exclusions J(4) and J(5)</u>

Exclusion J. Damage to Property, paragraph (4) provides that there is no coverage for property damage to "Personal property in the care, custody or control of the insured." (Pl. Ex. A at 000025). Exclusion J., paragraph (5) provides that there is no coverage for property damage to "that particular part of real property on which you or any of your contractors or subcontractors working directly or indirectly on your behalf are performing operations if the 'property damage' arises out of those operations." (Pl. Ex. A at 000025). According to the underlying complaint, Defendants negligently performed work on the saltwater disposal trough causing damages to the trough and other equipment. (Pl. Ex. B).

Essex argues that Defendants were performing welding work on the trough at the time of the fire, , and therefore the equipment and pieces comprising the saltwater disposal trough were in the care, custody or control of Defendants. Essex claims that Exclusions J(4) and J(5) combine to exclude coverage for any property damage to those items of personal or real property that were in McFadden's care, custody or control.

In response, Pointe Coupee claims that there is no allegation in the underlying complaint that the trough or other damaged property were in the care, custody or control of

McFadden. Because the allegations are silent on this point, Pointe Coupee argues that Essex must defend against these claims. Further, Great American alleges that as a result of the fire, in addition to the damage to the trough, there was damage to a small pump, a large welding pump, priming chambers, fencing, reinforced hose, an outdoor light pole, electrical wiring, and plumbing repairs. (Pl. Ex. B). There are no allegations that any of this equipment was associated with the trough, and Pointe Coupee argues that it is particularly hard to imagine things like fencing, an outdoor light pole, and electrical wiring would be so associated. Pointe Coupee argues that the exclusions only apply to property under the care, custody and control of the insured, not property "associated" with other property in the care, custody and control of the insured.

Under Texas law, a "care, custody or control" exclusion applies only to the "particular object of the insured's work, usually personalty, and to other property which [the insured] totally and physically manipulates." *Goswick v. Employers' Cas. Co.*, 440 S.W.2d 287, 289–90 (Tex. 1969). Where the property damaged is "merely incidental to the property upon which the work is being performed by the insured, it is not considered as in such 'care, custody or control' of the insured to be excluded under the policy." *Nat'l Fire Ins. Co. v. Entertainment Specialty Ins. Services, Inc.*, 485 F.Supp.2d 737, 743 (Tex.App.–Dallas, 1998); *see also Goswick*, 440 S.W.2d at 290 (Insured was hired to replace the pump of a well and the work required actual control of the rods and tubings of the well, but not the wall of the well. The Court found that the care, custody or control exclusion applied to the rods and

tubing but not to the wall of the well).

There are no allegations in the underlying complaint that Defendants had the right to exercise dominion or control over the trough, much less the rest of the disposal site. There are also no allegations that Defendants were performing any operations on the other damaged property, including the outdoor light pole, fencing, electrical wiring, and plumbing. As such, Essex cannot establish as a matter of law based solely on the allegations of the underlying petition that the exclusions apply. Accordingly, the Court finds that Exclusions J(4) and J(5) do not exempt Essex from the duty to defend.

Exclusion J(6)

Essex also claims that Exclusion J., paragraph (6) exempts Essex from the duty to defend. Exclusion J(6) excludes property damages to "that part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it." (Pl. Ex. A at 000025). "Your work" is defined as "work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." (Pl. Ex. A at 000035). Essex claims that this exclusion applies to the entire saltwater disposal trough, not just the particular area in which Defendants were performing their work.

In response, Pointe Coupee argues that Exclusion J(6) is specific and only applies to "that particular part" on which Defendants were working. Here, the trough is a self-contained, collective unit which is separate from the disposal pit, pumps, fencing, outdoor

electrical pole, and other separate equipment allegedly damaged in the fire. Defendants were hired to work on the trough but the damages sought are for repair of not just the trough but other equipment as well. Pointe Coupee claims that the entire disposal site is not one self-contained unit; it consists of many different units.

The case Essex relies on to support its proposition that the exclusion applies to the entire saltwater disposal trough is *Southwest Tank and Treater Mfg. Co. v. Mid-Continent Cas. Co.*, 243 F.Supp.2d 597, 603–04 (E.D. Tex. 2003)(Davis, J.). However, that case is distinguishable from the instant case because in that case the insured was hired to work on the entire tank, and the tank was a self-contained collective unit constituting a single item of property. *Id*. at 603. The insured in that case was hired to install tubes in the entire tank, and while the insured chose to install the tubing in sections, this did not change the fact that the entire tank was being worked on by the insured. *Id*. In that case, the defendant was hired to work on the tank and the damages sought in the underlying suit were only for the replacement of the tank. Here, Defendants were hired to work on the trough but the damages sought are for several different units and equipment. As such, Essex has not shown that Exclusion J(6) applies as a matter of law, and the exclusion therefore does not preclude Essex's duty to defend.

**5) Exclusion K Damage to Your Product**

Exclusion K. Damage to Your Product provides that there is no coverage for "property damage to 'your product' arising out of it or any part of it." (Pl. Ex. A at 000025). "Your

product" is defined as "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by ... you." (Pl. Ex. A at 000035).

Essex claims that Exclusion K applies in this case because the alleged damage arose out of goods or products handled by Defendants. According to Great American's allegations, Defendants' alleged negligence caused damage to Southland's disposal trough, along with "a small pump; large welding pump; priming chambers; fencing; reinforced hose; an outdoor light pole; electrical wiring; and, plumbing repairs." (Pl. Ex. B at par. V). Essex contends that this constitutes damage to equipment associated with the trough, and that Defendants accordingly caused property damage to goods and/or products it was handling during its performance of welding work. Therefore, Essex argues that the property damages sustained by Southland due to the alleged negligence in performing work on the saltwater disposal trough fall within Exclusion K.

In response, Pointe Coupee claims that the word "handled" is not defined in the Policy, and as such its ordinary definition must apply. Pointe Coupee cites Random House for the definition of handled, which is the past tense of "handle," meaning "to deal or trade in." (Doc. No. 24 at 17). Pointe Coupee contends that this definition is consistent with the use of the word handled in the Policy because handled is listed as a verb in conjunction with "manufactured," "sold," and "distributed." As such, Pointe Coupee argues that "handled" as it's used here does not simply mean in the possession of as suggested by Essex, but rather means "dealt in" or "traded by."

The Court finds that Pointe Coupee has offered a reasonable construction of the word handled. The word handled is used in the Policy in conjuction with "manufactured," "sold," and "distributed." In this context, defining handled as "dealt in" or "traded by" is a logical interpretation. Because Pointe Coupee has offered a reasonable construction of the words, the Court must adopt the interpretation offered by Pointe Coupee. *See Trinity Universal*, 592 F.3d at 692. There are no allegations that McFadden and KLN dealt or traded in the trough business. As such, the Court finds that Exclusion K is not applicable in this case.

**6) The Additional Insured Endorsement**

While Essex admits that Point Coupee is an Additional Insured under the Policy, Essex argues that the Policy does not afford coverage for Point Coupee because such coverage is limited to only those claims not otherwise excluded in the Policy and where coverage is provided to the Named Insured. (Pl. Ex. A at 000012). Essex contends that because it does not owe a duty to defend McFadden and KLN for the reasons it set out above, it likewise does not owe a duty to defend Pointe Coupee in the underlying lawsuit.

The Court has previously addressed the argument that Essex does not owe a duty to defend McFadden and KLN. The Essex policy does not clearly and unambiguously exclude coverage for the underlying claims, and as such Essex has a duty to defend McFadden and KLN. Accordingly, the Court finds that Essex has a duty to defend KLN and McFadden as Named Insureds and Pointe Coupee as an Additional Insured against the claims in the underlying lawsuit.

**7) Cross-claims Asserted by Pointe Coupee**

Finally, Essex alleges that it does not owe McFadden and KLN a defense against the cross-claims asserted by Pointe Coupee in the underlying action for the same reasons it does not owe a defense against the claims brought by Great American. Specifically, Essex re-alleges that KLN is not an insured under the Policy and that coverage is not afforded to KLN/McFadden because the alleged operations do not fall within the business description or classification. The Court has addressed these arguments above. For the same reasons the Court found that Essex had a duty to defend KLN and McFadden against the claims brought by Great American, the Court finds that Essex has a duty to defend KLN and McFadden against the claims brought by Pointe Coupee.

## V. Essex's Objections to Pointe Coupee's Summary Judgment Evidence

Also before the Court are Essex's objections to Pointe Coupee's summary judgment evidence (*See* Doc. No. 26). Essex objects to Pointe Coupee's use of extrinsic evidence and evidence that is not competent summary judgment evidence to support its response. Specifically, Essex objects to Pointe Coupee's use of (1) an Accord Commercial Policy Change Request Form, (2) a copy of a facsimile transmittal allegedly sent by Capstone Underwriters, Inc., and (3) a General Change Endorsement.

The Court's Order does not rely on the evidence Essex objects to. As such, Essex's objections to the evidence used by Pointe Coupee in its response to the motion for summary judgment are hereby DENIED.

## VI. Conclusion

The Court hereby finds that Essex owes a duty to defend McFadden, KLN, and PCE for the claims asserted by Great American in the underlying action. For the reasons stated above, Plaintiff

Essex's Amended Motion for Final Summary Judgment is hereby DENIED.

The Court will abstain from any ruling on the duty to indemnify until the underlying case has been resolved.

**It is SO ORDERED.**

**SIGNED this 3rd day of June, 2010.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE